# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| US Magnesium LLC,<br>238 North 2200 West<br>Salt Lake City, Utah 84116-2921<br>On behalf of itself and all others similarly<br>situated,<br><br><br>                 Plaintiff,<br><br>   vs.<br><br>CSX TRANSPORTATION, INC., BNSF<br>RAILWAY COMPANY, UNION PACIFIC<br>RAILROAD COMPANY, NORFOLK<br>SOUTHERN RAILWAY COMPANY, AND<br>KANSAS CITY SOUTHERN RAILWAY<br>COMPANY,<br><br>              Defendants. | Civil Action No. _____<br><br><br><br><br>**CLASS ACTION COMPLAINT and**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, US Magnesium LLC ("US Magnesium" or "Plaintiff") a limited liability company located in Salt Lake City, Utah, individually and on behalf of a class of all those similarly situated, brings this action for damages under the antitrust laws of the United States against Defendants, and alleges as follows:

## NATURE OF THE ACTION

1.    This is an antitrust class action charging five United States-based Class I railroads with price fixing in violation of Section 1 of the Sherman Act.  Plaintiff brings this action on behalf of itself and an alleged class of direct purchasers who purchased unregulated rail freight transportation services from Defendants and their co-conspirators from July 1, 2003 to the present (the "Class Period," which will also include the period from the date of this filing to the date of class notice) and who were assessed a rail fuel surcharge for the agreed-upon transportation.  As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.  Defendants collectively control over 90 percent of the rail freight traffic in the United States.

2.    The defendant railroads conspired to fix, raise, maintain, or stabilize prices of rail freight transportation services sold in the United States through use of rail fuel surcharges added to customers' bills.  A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads, purportedly to compensate for increases in the cost of fuel, for the agreed-upon transportation., .

3.    The Rail Fuel Surcharges imposed by the Defendants, however, can be explained only as a means to supracompetitively enhance revenue by levying charges in excess of actual fuel costs.  The Rail Fuel Surcharges were not intended to recover actual fuel costs. Significant revenue enhancement was the motive and the goal of the collective effort by Defendants to fix

2

and maintain fuel surcharges. The Defendants, who in the current era of railroad deregulation could no longer simply ask the now-defunct Interstate Commerce Commission to raise rates for all private rail freight, colluded to use the fuel surcharge program as the means to impose such an across-the-board rate increase.

4.     The Defendants implemented their conspiracy through a number of collective actions.

5.     First, the two major western railroads – Defendants BNSF Railway Company and the Union Pacific Railroad Company – in mid-2003 suddenly starting charging the exact same fuel surcharge. Up until this time, fuel surcharges were only intermittently applied, and the Defendants had different fuel surcharge rates, reflecting (among other things) that each Defendant had different fuel costs. In July 2003, however, BNSF and Union Pacific, began to move in lockstep, each now basing their fuel surcharge on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index"). At this time, the HDF Index was at a higher rate than the West Texas Intermediate ("WTI") Crude Oil Index that Union Pacific previously had been using. BSNF and Union Pacific remained in lockstep, using the HDF Index, through at least 2007. These actions by defendants BNSF and Union Pacific, however, were not sufficient to permit widespread use of fuel surcharges as a revenue-raising mechanism, because most private contracts still had cost escalation provisions that included fuel costs as a factor – meaning that a fuel surcharge escalating revenues could not also be readily used..

6.     The Defendants solved this problem through collective action: namely, by causing the Association of American Railroads (the "AAR"), a trade organization that can only act with the *agreement* of the Defendants, to publish a new index with fuel removed as an element of cost escalation. These standard cost escalation indexes – the Rail Cost Adjustment

Factor (the "RCAF") and the All-Inclusive Index (the "AII"), upon which the RCAF is based –
each account for a variety of cost factors, including fuel. The RCAF and AII weighted these
different factors so that the index would account accurately for the impact of particular cost
increases (e.g., for fuel). Thus, prior to December 2003, any actual increase or decrease in fuel
costs, no matter how large, could be captured in the RCAF and AII. *There was thus no need to
remove fuel from the existing Indexes in order to recover any fuel cost increases.*

7.      The AAR's December 2003 announcement – which could only have been made
with the *agreement* of the Defendants – stated that a new index, the All Inclusive Index Less
Fuel (AIILF) was being established. This new index was unlike the RCAF in that it  excluded
fuel, and it was not subject to review by the Surface Transportation Board. The AAR's official
publication, entitled "AAR Railroad Cost Indexes," announced: "This issue of AAR Railroad
Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is
calculated using the same components and methods as the All-Inclusive Index uses for the Rail
Cost Adjustment Factor, *with the exception of the exclusion of the fuel component*." (emphasis
added). This announcement, and the underlying removal of fuel from the AII and RCAF, were
the *collective action*  of the Defendants, which dominate and control the AAR. The AAR could
not have taken these steps without collective action by the Defendants.

8.      The AAR's action in December 2003 meant that the Defendants could now apply
Rail Fuel Surcharges more broadly than before, since fuel would no longer automatically be
covered by standard rate escalation clauses. Almost immediately after the AAR announcement,
the two major eastern railroads – Defendants CSX Transportation, Inc. and Norfolk Southern
Railway, Inc., each of which had different fuel costs – in early 2004 made the identical decision
that they would now have the same fuel surcharge and that these surcharges would be based on

the West Texas Intermediate ("WTI") Crude Oil Index (which in early 2004 was at a higher rate than the HDF Index that the Western Railroads simultaneously started to use in July 2003). As with the Western Railroads, the Eastern Railroads previously had different fuel surcharges (reflecting, among other things, their different fuel costs).This identical decision by the Eastern Railroads, coming on the heels of the Defendants' collective action in late 2003 to remove fuel from the AII and RCAF, eliminates any reasonable possibility that the Eastern Railroads decided independently to use the WTI in early 2004.

9.      Like the Western Railroads, the Eastern Railroads remained in complete lockstep, applying the exact same fuel surcharges, through at least 2007. Defendant Kansas City Southern put itself into lockstep with the Eastern Railroads in June 2005, and remained in lockstep from that point forward.

10.     The Defendants were able to use the Rail Fuel Surcharges as a revenue raising, rather than cost-recovery, mechanism, because the Defendants each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, when fuel was removed from the new AIILF index the Defendants applied the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, if the percentage increase triggered by the applicable fuel index was, for example, 15 %, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by 15% – even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF had been designed to reflect).

11.    Defendants were able to maintain their conspiracy by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly.  Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.

12.    The Defendants also took other collective action to enforce the conspiracy and make it effective.  For example, they largely stopped entering into long-term contracts and entered instead into contracts for periods of approximately 30 days, or with 30 day cancellation provisions -- making it easier to implement the fuel surcharges, which were adjusted monthly. The Defendants also limited the previously prevailing practice, in circumstances where more than one railroad was involved in long-distance freight transport, of sending a customer a single bill from the point of origin or the point of destination.  Instead, the Defendants increasingly used so-called "Rule 11 pricing," whereby each railroad on a multi-railroad trip would send a separate bill (and thus could separately impose its own fuel surcharge).  This facilitated each Defendant recouping its share of the supracompetitive profits.  Such a switch to "Rule 11 pricing" could be accomplished only through collective action of the Defendants.  The Defendants also began refusing to negotiate discounts on rail freight rates -- even in circumstances where individual railroads had previously been willing to do so.

13.    The collective actions of the Defendants, including effectively removing fuel from the AII and RCAF by creating the new AIILF, and moving into lockstep on fuel surcharges, cannot be explained as the result of routine market conduct to collect increasing fuel costs or even to do so more efficiently.  The fuel cost component in the AII and RCAF was just as effective as the separate fuel surcharges for recovering *actual* fuel costs.  Indeed, the AII had

been designed to ensure that fuel and other cost increases could be recovered, regardless of the size of the fuel cost increase. Rather, effectively by removing fuel from the AII and RCAF, and through their other collective actions, the Defendants devised and implemented a means to impose an across-the-board rate increase for rail freight transportation. Instead of competing on fuel prices given their differing fuel costs, the Defendants collectively created the type of across-the-board rate increase that they had been able to ask the now-disbanded ICC to impose during the pre-1980 period of complete rate regulation and then lawful collective railroad pricing activities.

14.    The Surface Transportation Board, in a ruling in early 2007 that addressed only the rail fuel surcharges at issue as applied to rate-regulated freight transport, held that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6. *See also id.* at 7 ("the term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. If it is used instead as a broader revenue enhancement measure, it is mislabeled.").

15.    As a direct and proximate result of this price fixing conspiracy, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiff and each Class member in their business and property. Plaintiff and the

members of the Class each have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

16.     Plaintiff seeks damages on behalf of itself and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

17.     Plaintiff US Magnesium LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 238 North 2200 West, Salt Lake City, Utah 84116-2921.

18.     During the class period, US Magnesium manufactured magnesium, chlorine, ferric chloride and other products. US Magnesium has annual sales in excess of $ 100 million, and pays in excess of $ 2.5 million per year in rail freight charges.

19.     US Magnesium purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on plaintiff in connection with that unregulated rail freight transportation. The prices plaintiff paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices plaintiff would have paid absent the conspiracy alleged herein. Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations. Plaintiff asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants imposed Rail Fuel Surcharges, during the Class Period.

20.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. In New Jersey, CSX maintains business offices at 1 Pennsylvania Ave, Kearny, New Jersey 07032. CSX also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City, Elizabeth, North Bergen, Kearny and Ridgefield, through which it originates and terminates rail traffic within this District. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States.

21.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. In New Jersey, NS maintains business offices at 125 County Road, Jersey City, New Jersey 07307. NS also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City and Elizabeth through which NS originates and terminates rail traffic within the District. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

22.     Defendants CSX and NS jointly own Conrail, which acts as a switching carrier for CSX and NS and operates almost 200 miles of rail lines in the northern half of New Jersey. The hub of Conrail activities in the region is Oak Island Yard in Newark, with smaller local serving yards in Bayonne, Greenville (Jersey City), Linden, Manville, Metuchen, Old Bridge, Port Reading (Woodbridge), Red Bank, and Newark, New Jersey.

23.     Together, CSX and NS move all rail traffic into and out of the New Jersey/New York area. The vast majority of that traffic originates or terminates within northern New Jersey, and in the environs of Newark. For example, each year CSX and NS handle to and from the

Newark area tens of thousands of carloads of various commodities, such as chemicals, and merchandise freight. Additionally, with respect to container (or "intermodal") traffic, in 2006 CSX and NS handled 339,000 containers at ExpressRail, the on-dock rail facilities in Newark. CSX and NS also handled an additional 100,000 plus containers moving in domestic service through other rail terminals in the Newark area.

24.    Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. In New Jersey, BNSF's wholly-owned subsidiary, BNSF Logistics, LLC, maintains business offices at 375 N. Main Street, Suite C-1, Williamstown, New Jersey 08094. BNSF also originates and terminates rail traffic within the District by providing transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

25.    Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. In New Jersey, UP maintains at least one employee or agent, though the business address is currently unknown. UP also originates and terminates rail traffic within this District by providing transportation in interchange service with CSX and NS. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including New Jersey).

26.    Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105.  In New Jersey, KCS maintains business offices at 1 Executive, Somerset, New Jersey 08873.  It also originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS.  KCS operates a major freight railroad in ten central and southeastern states.

## JURISDICTION AND VENUE

27.    This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15 , to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained by Plaintiff and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

28.    Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

29.    Venue is proper in the District of New Jersey pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391.  Defendants maintain offices, have agents, transact business, and are found within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

30.    This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and others similarly situated.  The "Class" is defined as:

> All purchasers of rail freight transportation services from Defendants (the "Class"), through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to the present (the "Class Period").  Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint.

32.     The Class is so numerous that joinder of all members is impracticable.  Given the magnitude of the commerce involved, the members of the Class are geographically dispersed, and joinder of all class members would be impracticable.  While the exact number of Class members is unknown to plaintiff at this time, plaintiff believes that there are, at a minimum, thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

33.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of Defendants in connection with the restraint of trade alleged herein.  Plaintiff and the members of the Class have all sustained damage in that they paid inflated prices for the unregulated rail freight transportation services at issue as a result of Defendants' conduct in violation of federal law.

34.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

35.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.    Whether Defendants conspired, contracted or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

      b.    Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

      c.    Whether Defendants' conduct violated the federal antitrust laws; and

      d.    Whether Defendants' conduct caused injury to the business and property of plaintiff and the Class and, if so, the proper measure of damages.

36.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

37.     The interests of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

38.     During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States.  The US market for rail transportation services is estimated at more than $51 billion in 2006.

39.     The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce.  During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States.  Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

40.     The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

41.     Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980.  This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

42.     Prior to the Staggers Act, railroads generally would only charge for freight transport the published tariff rates filed by the railroads with the ICC. During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis..

43.     Today, by contrast, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are free of rate regulation. For all of this unregulated traffic, the railroads cannot turn to some agency – like the old ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates..

44.     Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). Five of these railroads – the Defendants in this case – operate more than 90 percent of all railroad track in the U.S. and account for more than $51 billion in total annual revenue.

45.     Rail freight shippers across the nation are being subjected to an endless string of rate increases by railroads made possible by a concentrated market structure, and coordinated pricing. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

46.     The railroad industry today does not behave like a competitive market. Instead, it is dominated by the Defendants. As one prominent railroad economist put it: "[R]ates charged shippers are surging and bottom lines are growing as if on steroids." Frank N. Wilner, *A Tale of Two (Railroad) Stories*, 72 JOURNAL OF TRANSPORTATION LAW, LOGISTICS AND POLICY 235, 238 (2005).

## THE RAILROADS INTRODUCE FUEL SURCHARGES

47.     By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe (BNSF) and Canadian National Railway Co. (CN) merger, the Surface Transportation Board ("STB"), which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. Railroads were experiencing surging freight demand and tight capacity. In this environment, the railroads faced a stark choice: build new rail capacity to meet growing demand, or squeeze more revenue out of shippers using existing capacity. The railroads chose the latter course and seized on the Rail Fuel Surcharge as the means to implement what in effect became across-the-board rate increases.

48.     Since passage of the Staggers Act in 1980, railroads had increasingly entered into transportation contracts with cost escalation provisions often tied to the RCAF and the AII on which the RCAF is based. Both the RCAF and the AII are published by the AAR, and both Indexes include fuel costs as a factor. The RCAF and AII weight a number of cost factors, including fuel, so that the impact of particular cost increases (e.g., for fuel) is reflected in the index. Any actual increase in fuel costs – no matter how large – would be reflected in the RCAF and AII.

49.     In December 2003, the AAR – which is controlled and dominated by the Defendants – announced, for the first time, the creation of a new index called the All Inclusive Index Less Fuel (i.e., a cost escalation index without fuel as a component). This new index was calculated using the same components and methods as the AII uses for the RCAF, except that it excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for

16

the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component."
This announcement was the *collective action* of the Defendants, and could not have been
accomplished without such collective action.  The new All-Inclusive Index Less Fuel specified
the fourth quarter of 2002 as its base period.

50.     The Defendants jointly decided to cause the AAR to inaugurate the All Inclusive
Index Less Fuel so that Defendants, which controlled the AAR, could begin assessing separate,
stand-alone Rail Fuel Surcharges and coordinating that practice.  The creation of this new index
was an important, carefully-planned step taken collectively by the railroads to allow
implementation and continuation of their price fixing conspiracy – a conspiracy that would
enable the Defendants to impose price increases on the entire cost of rail freight transport.

51.     Following publication of the All Inclusive Index Less Fuel,  Defendants seized
the opportunity and began increasingly to apply a Rail Fuel Surcharge as a separate item on the
shipper's bill.

52.     There is no legitimate business justification for the collective action of the
Defendants to cause the AAR to adopt and publish an All Inclusive Index Less Fuel.  The AII
and RCAF both included a fuel cost component, and the Defendants had used these indices for
decades to measure fuel-cost increases.  Indeed, as an empirical matter, the fuel component of
the AII closely tracks both the WTI Index and the HDF Index used by the railroads, and the AII
is equally effective as those Indexes for recovering fuel costs.  However, because the AII weights
the various costs factors, the total AII percentage reflects actual cost increases for each of the
cost factors, including fuel.  Thus, Defendants' motivation in collectively causing the adoption of
the All-Inclusive Index Less Fuel could not have been greater fuel cost recovery or more
efficient fuel cost recovery.  Rather, by effectively removing fuel from the AII, the Defendants

could proceed collectively to apply the fuel cost increase percentage to the *entire cost of the freight shipment* (notwithstanding that fuel only accounts for a portion of the cost of the shipment). This allowed the Rail Fuel Surcharge to be used to increase revenue, rather than simply recover actual costs.

53. These actions by the Defendants were not independent responses to a common problem of increasing fuel costs. Rather, the Defendants' only purpose in taking these collective actions was to begin assessing a stand-alone fuel surcharge applied to *revenue (i.e.,* the entire base rate for the freight shipment), not costs, and to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers. Through this collective action, Defendants sought to use the stand-alone fuel surcharge as an easy way to dramatically increase revenues without having to wait for new rail capacity to come on line to meet growing demand – so long as all the Defendants participated and did not undercut each other.

### DEFENDANTS' FUEL SURCHARGES

54. The key elements of this price fixing conspiracy were an agreement by Defendants to act in concert with one another in establishing the new AIILF, and applying the resulting Rail Fuel Surcharges to the total cost of freight shipments, an agreement on common trigger points for adjusting the Rail Fuel Surcharges on a monthly basis, an agreement to move away from long-term contracts to more effectively impose the monthly Rail Fuel Surcharges, an agreement to move to Rule 11 pricing to allow each railroad to collect its own share of the Rail Fuel Surcharge revenues, and an agreement not to depart from the Rail Fuel Surcharges reflected in the agreed upon index. Pursuant to this conspiracy, Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate (*i.e.*, revenue), rather than as a percentage of the actual cost of fuel consumption associated with the individual movement to which the surcharge was applied.

55.     Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs.  Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure.  The program has been intended to achieve – and has succeeded in achieving – across-the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

56.     Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge percentages on their websites.  They did so for purposes of monitoring and enforcing the agreed-upon Rail Fuel Surcharge levels.

57.     As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels throughout the Class Period.

58.     On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied.  *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

59.     The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint).  The STB expressly stated that its decision does not apply to rail freight traffic under private contract or otherwise exempted from rate regulation, since the STB has no jurisdiction over these contract or otherwise exempt movements.

60.     Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## ELEMENTS OF THE PRICE FIXING CONSPIRACY

61.     The essential element of Defendants' conspiracy was an agreement to compute Rail Fuel Surcharges not as a cost recovery mechanism for the specific transportation to which it was applied, but as a multiplier percentage of the base rate charged for the rail freight transportation involved.  Defendants applied these surcharges not only to published tariff rates, but to private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

62.     Defendants began to implement their conspiracy at least as early as July 2003 when the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate their prices relative to Rail Fuel Surcharges.  Prior to this time, the UP fuel surcharge was adjusted monthly based on the WTI Index.  The BNSF fuel surcharge was based on the HDF Index.  In or about July 2003, however, the UP switched to the HDF Index pursuant to an agreement with the BNSF.  At the time, the HDF Index yielded a higher percentage than did the WTI.  From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the class period.

63.     The Western Railroads agreed to administer the HDF Index in precisely the same way.  Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied.  When the HDF Index exceeded $1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon.  So, for example, if the HDF Index rose to $1.55

per gallon, the Western Railroads would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

64.     The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

65.     The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF average price had changed. The fact that the Western Railroads both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

66.     Using the HDF index, the two Western Railroads moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

67.     The chart below shows that the Fuel Surcharge Percentages charged by the Western Railroads for carload shipments varied before the Class Period began, but were identical starting in July 2003:

## MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP |
| --- | --- | --- |

| MONTH | BNSF | UP |
|--------|------|------|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |

| MONTH  | BNSF  | UP    |
|--------|-------|-------|
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |

68.    Almost immediately after the announcement in December 2003 of the new All Inclusive Index Less Fuel, Defendants CSX and NS, located in the east, suddenly moved into lockstep with fuel surcharges based on the WTI Index. In early 2004, the WTI Index yielded a higher fuel surcharge than the HDF Index in use by the Western Railroads. KCS, located in the Midwest, agreed to join the lockstep pricing in June 2005. (Defendants CSX, NS and KCS collectively are the "Eastern Railroads"). Indeed, not only did these railroads all agree to use the WTI index (as opposed to many other available indices); they also agreed to administer the index in precisely the same way.

69.    Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

70.     The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads.  For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, Defendants could apply exactly the same fuel surcharge percentage month after month.  The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

71.     The choice to use the WTI index for fuel surcharges was arbitrary.  Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed.  The fact that Defendants CSX, NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior.  The similarities are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

72.     The net result is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period.  KCS adopted the same WTI Index in June 2005, and moved in lockstep with them for the remainder of the Class Period.  KCS has different operations and fuel consumption patterns from the larger U.S. railroads, making it unlikely that the KCS would adopt the same fuel surcharge percentages as the other railroads absent a conspiracy.

73.     The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before the Class Period, but were identical

starting in March 2004, and KCS also had identical Fuel Surcharge Percentages starting in June

2005:

### MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS | KCS |
|---|---|---|---|
| Jun-03 | 2.4% | 2% | |
| Jul-03 | 2.4% | 2% | |
| Aug-03 | 3.2% | 2% | |
| Sep-03 | 3.2% | 2% | |
| Oct-03 | 3.6% | 2% | |
| Nov-03 | 2.4% | 2.0% | |
| Dec-03 | 3.2% | 2.0% | |
| Jan-04 | 3.6% | 2.0% | |
| Feb-04 | 4.0% | 2% | |
| **Mar-04** | **4.8%** | **4.8%** | |
| Apr-04 | 4.8% | 4.8% | |
| May-04 | 5.6% | 5.6% | |
| Jun-04 | 5.6% | 5.6% | |
| Jul-04 | 7.2% | 7.2% | |
| Aug-04 | 6.4% | 6.4% | |
| Sep-04 | 7.2% | 7.2% | |
| Oct-04 | 8.8% | 8.8% | |
| Nov-04 | 9.2% | 9.2% | |
| Dec-04 | 12.4% | 12.4% | 10.0% |
| Jan-05 | 10.4% | 10.4% | 10.0% |
| Feb-05 | 8.4% | 8.4% | 10.0% |
| Mar-05 | 9.6% | 9.6% | 10.0% |
| Apr-05 | 10.0% | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% | 10.0% |
| **Jun-05** | **12.4%** | **12.4%** | **12.4%** |
| Jul-05 | 10.8% | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% | 19.2% |

| MONTH | CSX | NS | KCS |
|-------|------|------|------|
| Aug-06 | 19.2% | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% | 12.8% |

74.     In stark contrast to this uniformity in fuel surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants have moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges.

75.     In agreeing to collude on fuel surcharges, each Defendant was acting against its short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge in an effort to increase their market share. Rather than engage in normal competitive behavior, Defendants instead restricted their freedom to price competitively and instead adhered to an industry-wide pattern of uniform fuel surcharge pricing. There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges for more than a three year period could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. It could only have been achieved by an express agreement – first, to decouple fuel prices from the historical railroad cost indices and, second, to agree upon new indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use

generally increasing fuel costs as a cover for implementing what was, in effect, across-the-board rate increases.

76.    Thus, as detailed above, including in paragraphs 1-16 and 38-75,  when fuel prices were rising significantly in 2003, the Defendants seized the opportunity and collectively created a new escalation scheme based on the newly created AIILF.  From July 2003 through 2007 in the case of  Defendants BNSF and UP, and from June 2004 through 2007 in the case of CSX and NS, the Defendants remained in *complete lockstep* with respect to fuel surcharges. Defendant KCS got into lockstep with the Eastern Railroads in June 2005, and remained in exact lockstep from that point forward.  In addition, the Defendants each applied the fuel surcharge the same way:  as a percentage multiplier of the total base rate for the rail freight transportation. That is Defendants applied the fuel surcharge percentage to the *entire* cost of the freight transport (even though fuel only accounted for a portion of that total cost).  The Defendants also all used the exact same fuel surcharge price timing to coordinate implementation of their agreed-upon fuel surcharge rates.

77.    Defendants were thus able to maintain the uniformity of prices in Rail Fuel Surcharges by computing the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices and trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.

### ADDITIONAL EVIDENCE OF A CONSPIRACY

78.    Apart from this direct evidence of price fixing, there is further support for the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges.  The rail transportation industry is marked by certain structural and other characteristics that make a price fixing cartel feasible:

a.      Defendants had a motive to enter into a price fixing conspiracy because conditions existed in the railroad industry that were conducive to collusion. The railroad industry is highly concentrated. Defendants in this case are the five remaining domestic Class I railroads following decades of mergers and consolidation. Defendants account for well over 90 percent of the nation's rail traffic, and there is no fringe or niche market of smaller carriers. There are also high fixed costs in the industry. Such high concentration and fixed costs facilitate a price fixing cartel. Indeed, the railroad industry today is a textbook example of an industry susceptible to efforts to maintain a price fixing conspiracy.

b.      There are significant barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These take decades to develop, and require onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

c.      Rail Fuel Surcharges, when computed as a percentage of revenue, are highly standardized. Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that

28

markets having uniform and homogeneous products or services, such as rail freight transportation services, are susceptible to price fixing.

   d. The railroad industry has a history of price fixing and other anti-competitive behavior.  In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt.  Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees."  The Rail Fuel Surcharge program engaged in by the Defendant's is strikingly similar to those collective rate-making practices of the past.

   e. The CEO's of Defendants are all board members of the AAR, which facilitated transfer of pricing information.  The AAR describes itself as "the central coordinating and research agency of the North American rail industry."  Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies).[1]  The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

  79. Apart from these structural market features, Defendants did not behave as if they were in a competitive market.  Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

---

[1] A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars).  There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) CSX; (3) Grand Trunk Corporation; (4) KCS; (5) NS; (6) Soo Line (footnote continued)

80.    Several national shipper organizations in fact met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only the BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. That is, BNSF reduced fuel surcharges on traffic where it faced no competition from the UP, and thus would not violate the agreement to fix competitive prices. The other Defendants refused to address the concerns of their customers.

81.    At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" semi-annually, quarterly or monthly. Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether. This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase market share and their pricing became more visible to each other.

82.    Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk. Similarly, in a competitive market, one would expect that the railroads would

---

Railroad Co.; and (7) UP. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. The Defendants, however, collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand. This coordinated behavior, hardly routine market conduct, gives rise to an inference of price fixing.

83.     Defendants also decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the termination railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). Instead, Defendants moved increasingly to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one railroad, the two rates are stated separately rather than as one quote for the entire shipment. Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge..

84.     Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant. The fact that market shares did not did not fluctuate significantly during the Class Period is further indication that Defendants agreed to fix prices rather than to compete for new sales.

## DEFENDANTS PROFITED FROM THE SURCHARGES

85.     Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But since the beginning of the Class Period, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the

31

base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

86.     Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharges. Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge. During the period of the conspiracy (June 1, 2003 to the present), Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, or an increase of about 160 percent This dramatic increase is in part attributable to fuel surcharge revenue realized by the railroads from their price fixing conspiracy.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

87.     The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

    a.    The Rail Fuel Surcharges charged to plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

    b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

    c.    competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

88.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, plaintiff and the members of the Class have sustained injury to their business or property.  The injury sustained by the plaintiff and the Class is the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation Of § 1 Of The Sherman Act And & 4 Of The Clayton Act)

89.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

90.    Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

91.    The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

92.    Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

93.    The contract, combination or conspiracy has had the following effects:

a.    Prices charged to plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra competitive levels;

b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c.    competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

94.    As a proximate result of Defendants' unlawful conduct, plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1)    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiff be denominated as class representative, and that plaintiff's counsel be appointed as counsel for the Class;

(2)    That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3)    That plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of plaintiff and each and every member of the Class;

(4)    That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5)     That plaintiff and the Class recover treble damages, as provided by law;

(6)     That plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

(7)     For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial as to all issues triable by a jury.

Dated: November 23, 2007

Paul M. Donovan (D.C. Bar # 105189)
LAROE, WINN, MOERMAN &
DONOVAN
1250 Connecticut Avenue, NW
Suite 200
Washington, DC 20036
Telephone: (202) 298-8100
Facsimile: (202) 298-8200
Email: paul.donovan@laroelaw.com

Stephen Neuwirth
Philippe Selendy
Sami H. Rashid
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email stephenneuwirth@quinnemanuel.com
phillipselendy@quinnemanuel.com
samirashid@quinnemanuel.com

Daniel Brockett
David Azar
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
865 S. Figueroa Street
Los Angeles, California 90017
Telephone: (213) 443-3000
Email: danielbrockett@quinnemanuel.com

davidazar@quinnemanuel.com

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, BAIN, GILFILLAN,
CHECCHI, STEWART & OLSTEIN
5 Beeker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Email: jcecchi@carellabyrne.com
        ltaylor@carellabyrne.com

Richard Scruggs
Sidney Backstrom
SCRUGGS LAW FIRM, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, Mississippi 38655
Telephone: (662) 281-1212
Email: richardscruggs@scruggsfirm.com
        sidbackstrom@scruggsfirm.com

Attorneys for Plaintiff

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS** US MAGNESIUM LLC

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

UTAH, SALT LAKE CITY

**DEFENDANTS** CSX TRANSPORTATION, BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, KANSAS CITY SOUTHERN

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
PAUL M. DONOVAN
LAROE, WINN, MOERMAN & DONOVAN
1250 CONNECTICUT AVE

Case: 1:07-cv-02116
Assigned To : Friedman, Paul L.
Assign. Date : 11/23/2007
Description: Antitrust

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP** FOR PLAINTIFF AND ...

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☒ A. Antitrust**
☒ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| □ G. *Habeas Corpus/ 2255*<br><br>□ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ H. *Employment Discrimination*<br><br>□ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ I. *FOIA/PRIVACY ACT*<br><br>□ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | □ J. *Student Loan*<br><br>□ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| □ K. *Labor/ERISA (non-employment)*<br><br>□ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ L. *Other Civil Rights (non-employment)*<br><br>□ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ M. *Contract*<br><br>□ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ N. *Three-Judge Court*<br><br>□ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒1 Original Proceeding    □ 2 Removed from State Court    □ 3 Remanded from Appellate Court    □ 4 Reinstated or Reopened    □ 5 Transferred from another district (specify)    □ Multi district Litigation    □ 7Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*15 U.S.C. § 1 & 15 U.S.C. § 15*

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23 | **DEMAND $** | Check YES only if demanded in complaint<br>**JURY DEMAND:** ☒ YES   □ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ☒ YES   □ NO    If yes, please complete related case form.

DATE *11-23-07*    SIGNATURE OF ATTORNEY OF RECORD *[signature]*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.